**PINE PRODUCTS CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 50–87C.**

United States Claims Court.

May 26, 1988.

John B. Crowell, Jr., Portland, Or., attorney of record, for plaintiff. Spears, Lubersky, Campbell, Bledsoe, Anderson and Young, Portland, Or., of counsel.

Paul J. Ehlenbach, with whom were Asst. Atty. Gen. Richard K. Willard, and Director David M. Cohen, attorneys for defendant. Deputy Asst. Gen. Counsel James P. Perry, and Rhea Daniels Moore, Dept. of Agriculture, of counsel.

## OPINION

WIESE, Judge.

The Federal Timber Contract Payment Modification Act ("the Act"), 16 U.S.C. § 618 (Supp.III 1985), permits holders of certain contracts for the purchase and log-

ging of federal timber to be released from a portion of their contract obligation upon payment to the Government of a buy-out charge. In 1985, Pine Products Corporation, plaintiff here, was a 50–percent participant in a joint venture that was granted relief under the terms of the Act. In the present action, Pine Products seeks a partial refund of the buy-out charge that the joint venture paid to the Government, the contention being that the charge was incorrectly determined due to an erroneous interpretation of the Act. Defendant denies this assertion; additionally, it raises the argument that Pine Products is not the proper party plaintiff. This suit, maintains the Government, cannot go forward without joinder of the other venturer as a party to the action.

The case is before the court on cross-motions for summary judgment. After considering the parties' briefs and their oral arguments, the court concludes that the Government is entitled to prevail on the jurisdictional issue as well as on the merits.

## FACTS

*The Act*

During the 1970's, accelerating inflation, predictions of high demand for housing and fears of future shortages in the Nation's timber supply influenced many companies to contract for the purchase of federally-owned timber at prices well above appraised market values. Beginning in late 1981, however, the advent of sharply higher interest rates and reduced inflation led to a significant downturn in lumber prices. As a result, logging companies holding high-priced contracts for the cutting of Government-owned timber faced the prospect of incurring substantial losses.

Congress, fearing permanently adverse consequences for these companies, their workers and timber-dependent communities, responded by proposing the Timber Contract Payment Modification Act. In the cautioning words of Senator Mark Hatfield

of Oregon, one of the principal sponsors of the relief legislation, rigid insistence by the Government on enforcement of its timber contracts would have "devastating impacts." 130 Cong.Rec. S11,882 (daily ed. Sept. 26, 1984).

The Act, which was signed into law on October 16, 1984, allowed purchasers of qualifying federal timber sale contracts (*i.e.*, contracts bid prior to January 1, 1982 and held as of June 1, 1984) to buy out up to fifty-five percent of the contract timber volume then remaining to be cut, with any one purchaser being limited to a maximum allowable buy-out of 200 million board feet. 16 U.S.C. § 618(a)(2)(B). A purchaser's buy-out charge would be determined by comparing the potential losses on all its timber sale contracts with its net book worth.

The statute established a three-tiered payment schedule. First, for companies whose potential losses were calculated to exceed 100 percent of net worth, the buy-out charge was a flat rate—$10 per thousand board feet. 16 U.S.C. § 618(a)(3)(A)(i). Next, for companies whose expected losses fell between 50 percent and 100 percent of net worth, the buy-out fee was set at 10 percent of the contract overbid[1] but not less than $10 per MBF.[2] 16 U.S.C. § 618(a)(3)(A)(ii). And finally, for companies whose projected losses came to 50 percent or less of net worth, the buy-out rate amounted to 15 percent of the contract overbid or at least $10 per MBF. 16 U.S.C. § 618(a)(3)(A)(iii). The highest buy-out rate (*i.e.*, 15% of contract overbid) also applied in the case of a purchaser who elected not to provide net worth information to the Government. 16 U.S.C. § 618(a)(3)(D).

For the purposes of calculating net worth as well as determining the limitation on the volume of timber to be bought out, the Act mandated that affiliated companies be treated as a single entity. 16 U.S.C. § 618(a)(7)(A).

---

**1.** The term "contract overbid" is the "difference between the advertised contract rate and the rate the purchaser bid." 16 U.S.C. § 618(a)(3)(F).

**2.** "MBF" is an acronym for a unit of timber measurement meaning thousand board feet.

## The Joint Venture

Pine Products Corporation is an Oregon corporation engaged in the manufacture of forest products. In 1980, Pine Products entered into a joint venture agreement with another forest products company, Timber Investors, Inc. The purpose of the Pine Products/Timber Investors Joint Venture ("joint venture") was to bid upon, and, if awarded, to operate the Fawn Spring Timber Sale Contract—a multi-year logging contract involving the harvesting of an estimated 20.6 million board feet of ponderosa pine and Douglas fir from the Ochoco National Forest that had been offered for sale by the United States Forest Service.

The joint venture agreement contemplated equal participation between the two partners (the co-venturers) in the operation of their common enterprise. Thus, the two companies agreed to contribute equally to the capital necessary for the purchase of the Fawn Spring timber and to share equally all obligations, burdens and benefits arising from award of the contract.

On July 17, 1980, the Fawn Spring contract was awarded to the Pine Products/Timber Investors Joint Venture. In September of 1985, following the decline in timber values, the joint venture applied for buy-out of the remaining uncut volume on its Fawn Spring contract. At the same time, plaintiff and Timber Investors submitted separate applications to buy out of individual commitments which each had entered into under other Forest Service contracts.

Upon receipt of these applications, the Forest Service advised the parties that they would be obliged to individually recognize their proportionate share of the joint venture's buy-out volume. That is to say, for volume limitation purposes, the joint venture was not to be treated as a separate entity. Additionally, the Forest Service indicated that the buy-out applications would have to be corrected to show the names of all affiliates.

New applications were submitted in conformance with these instructions. As part of these revised submissions for contract buy-out, plaintiff and the joint venture each furnished information showing net book worth. Timber Investors, however, did not provide such information.

The Forest Service acted on these applications in October of 1985. Plaintiff was authorized a buy-out of some 40.4 million board feet, a volume limitation that took into account one-half of the joint venture's uncut timber. Since plaintiff's potential contract losses exceeded its net worth, it qualified for the minimum buy-out charge of $10 per MBF. 16 U.S.C. § 618(a)(3)(A)(i).

With regard to the joint venture—which is the matter of concern here—the Forest Service concluded that Pine Products and Timber Investors were affiliates of the joint venture and that, for purposes of fixing the applicable buy-out rate and net worth figures, the three companies were to be viewed as a single entity. Based on this conclusion and the fact that Timber Investors had failed to provide net worth information, the Forest Service assessed a buy-out charge of 15 percent of the contract overbid—the rate which is statutorily prescribed in those instances where complete net worth data is not disclosed by the purchaser's buy-out application. 16 U.S.C. § 618(a)(3)(D).

On December 9, 1985, Pine Products filed an administrative appeal on its own behalf challenging both branches of the Forest Service's decision—the determination finding Pine Product and Timber Investors to be affiliates of the joint venture and the determination deeming them to be a single entity for net worth calculation purposes. Plaintiff contended that each of these determinations had gone beyond the letter of the statute and had resulted in the imposition of an excessive buy-out rate. As plaintiff sees it, one-half of the eligible buy-out volume should have been assessed at $10 MBF, the minimum rate which applied to plaintiff's separately held contracts.[3] The

---

3. The total buy-out charge paid by the joint venture was $383,358.15. This payment was

$128,839 more than would have been due had one-half the volume been assessed at $10 MBF.

Chief of the Forest Service denied the appeal and affirmed the decision issued by the Regional Forester.[4] A suit challenging the administrative decision was filed here on February 2, 1987.

## DISCUSSION

### The Jurisdictional Issue

As previously indicated, the Government has moved to dismiss the suit on the ground that plaintiff has failed to join a necessary party, namely, Timber Investors. In support of this contention, the Government points out that all aspects of the transaction in question were carried out in the name of the joint venture, not the plaintiff. The joint venture was identified as the purchaser of the timber sales contract; the joint venture submitted the application for contract buy-out; the joint venture was assessed the buy-out charge; and, finally, the joint venture was the entity that paid the buy-out charge. Under these circumstances, says the Government, the questions of statutory interpretation at issue necessarily require the presence of the other co-venturer since it is the joint venture's contractual and statutory rights that are being litigated.

Plaintiff urges a different view. To start with, it says that a joint venture is not a separate legal entity and therefore its absence as a party from the lawsuit cannot be viewed as a jurisdictionally-fatal defect. The important question, says plaintiff, is whether the court has before it the real party in interest—the party whose right is at issue.

Plaintiff maintains that that requirement is satisfied here given the argument it makes on the merits: that the Act, properly interpreted, requires the assessment of separate buy-out charges calculated on the basis of each co-venturer's own net worth. In other words, plaintiff takes the position that the Act itself calls for treating participants in a joint venture in their individual capacities. Hence, plaintiff argues it is entitled to pursue its relief in this court without naming the joint venture as the real party in interest or joining the other co-venturer as a necessary party.

█ The court does not agree with plaintiff's argument. The basic question here is not whether plaintiff paid too much as a buy-out charge. Rather, the question is whether the joint venture did. Therefore, the right in issue belongs to the joint venture, not to plaintiff in its individual capacity. The suit therefore demands the joinder of plaintiff's co-venturer for the universal rule is that an individual co-venturer may not sue in his own name to enforce a liability owed the joint venture. *Bernitt v. Smith-Powers Logging Co.*, 184 F. 139, 143 (C.C.D.Or.1911); *General Eng'g Corp. v. Virgin Islands Water*, 636 F.Supp. 22, 39 (D.V.I.1985); *Heinz v. Simon & Flynn, Inc.*, 444 F.Supp. 114, 117 (S.D.N.Y.1978); *Kemp v. Murray*, 680 P.2d 758, 759 (Utah 1984).

This result is not avoidable by the fact that the refund which plaintiff seeks is limited to a portion of the buy-out charge measured by its own net worth. That in itself does not change the character of the demand from one belonging to the joint venture to one belonging exclusively to plaintiff. Indeed, for all we know, Timber Investors might well insist that it is entitled to share in any recovery, or, for that matter, to raise similar contentions in its own right.

This last observation raises a final point that needs to be made. Considerations of economy in the use of judicial resources and a party's right not to be subjected to multiple lawsuits on the same subject matter dictate that all parties having an interest in the claim in issue be before the court at the same time. Therefore, even if one could overcome the force of the rule that demands the joinder of all co-venturers in the pursuit of a common claim, it would

Thus, it is this $128,839 to which plaintiff claims entitlement.

**4.** Because the Secretary of Agriculture did not exercise his discretionary review, the Chief's de-

termination became the final administrative decision of the Department of Agriculture. 36 C.F.R. 211.18(f)(2)–(6) (1985).

clearly be unwise to adopt such a course. We conclude, therefore, that this case should be dismissed for failure to join an indispensable party, namely, Timber Investors, Inc.[5]

*The Merits Issue*

Notwithstanding the determination reached on the jurisdictional issue, the interests of economy dictate that the court go on to address the case on the merits since the parties have devoted much time and attention to that phase of the litigation. Accordingly, the discussion that follows, though it amounts at this juncture to no more than an advisory ruling, nevertheless states the court's views of the case on the merits.

 As it did in the proceedings below, plaintiff here attacks the Forest Service's decision for what it contends was a compound error in the interpretation of the Act. Plaintiff maintains, for reasons we take up shortly, that neither Pine Products nor Timber Investors can properly be regarded as affiliates of the joint venture. Additionally, it contends that the Forest Service erred in concluding that the three separate businesses—Pine Products, Timber Investors and the joint venture—together constituted a single entity for purposes of determining the buy-out charge.

The dispute focuses upon subsections (A) & (B) of 16 U.S.C. § 618(a)(7) which provide as follows:

(A) For purposes only of determining a purchaser's buy-out limitation under subsection (2) and net worth in connection with buy-out cost under subsection (3), concerns which are affiliates as defined under paragraph (B) of the subsection shall be treated as a single entity.

(B) Definition of affiliates: Concerns are affiliates of each other when either directly or indirectly, one concern controls or has the power to control the other, or a third party or parties controls or has the power to control both. In determining whether or not affiliation exists, consideration shall be given to all appropri-

ate factors, including, but not limited to, common ownership, common management, and contractual relationships.

In applying the statute to the joint venture's request for buy-out, the Forest Service looked first to the definition of affiliates. Among other points, the agency concluded that "control" within the meaning of the Act "may be affirmative or negative and it is immaterial whether it is exercised so long as the power to control exists." Indicia of control, the agency further observed, include "common ownership, common management, and contractual relationships."

Based on this reasoning, and lacking any evidence demonstrating a contrary allocation of power between them, the agency concluded that "each participant in the Joint Venture has the power to control the Joint Venture." Thus, in accordance with the statute's directive (§ 618(a)(7)(A)), each participant was deemed to be an affiliate of the joint venture. And affiliates, as the statute further specified (§ 618(a)(7)(B)), "shall be treated as a single entity" for purposes of determining a purchaser's buy-out limitation and net worth. This, then, is how the Forest Service reasoned the matter.

Now to the plaintiff's arguments. To start with, plaintiff reads the text of § 618(a)(7)(A) to say that a finding of affiliation is permissible only in those situations where control is exercisable by a *single* business entity. The argument comes directly from that part of the statute's text which refers to concerns being affiliates of each other when "*one* concern controls or has the power to control the other." (emphasis added). Plaintiff takes the reference to "one concern" to mean *only* "one concern."

The court cannot accept such a narrow reading of the statute. In our view, the emphasis in the statute falls naturally on the word "control" and not upon the phrase "one concern"; hence we regard the text

---

5. Though Pine Products was made aware of the Government's jurisdictional argument right from the start, no effort was made to have

Timber Investors join the lawsuit. As explained at oral argument, plaintiff's conclusion was that such joinder was unnecessary.

as intending a general description of control rather than one specifically limited to a two-firm context. This interpretation is strengthened by the fact that, in determining whether or not affiliation exists, the statute specifically directs that consideration be given to all appropriate factors, including "common ownership, common management, and contractual relationships." Certainly these factors do not suggest an inquiry regarding affiliation that is to be confined to only two members.

Virtually the same issue we address here came before the district court in *Mt. Adams Veneer Co. v. Lyng*, No. 87–108 FR (D.Or. Nov. 9, 1987) [available on WESTLAW, 1987 WL 46898]. That court upheld the Forest Service's position that "control" for purposes of Section 618 embraced negative as well as affirmative exercises of power. In affirming this construction of the statute, the court noted that the Forest Service had taken its definition from the Small Business Administration's regulations, and, further, that adoption of that agency's regulations was expressly sanctioned in the Act's legislative history. Thus, the court concluded: "in light of the legislative history of the Act, this interpretation is a permissible one." *Id.* at 8.

The Senate report, to which the district court referred, states as follows:

> The definition of affiliates contained in subparagraph (7)(B) is adapted from the Small Business Administration's definition of affiliates, contained at 13 CFR § 121.3–2(a). This regulation contains a number of further definitions and examples to which the secretaries should look for guidance in determining affiliation for purposes of this legislation.

S.Rep. No. 98–596, 98th Cong. 2d Sess. 4, 12, *reprinted in* 1984 U.S.Code Cong. & Ad. News 3796, 3805.

In light of this legislative history, we can see no basis upon which to question the Forest Service's definition of control. Accordingly, we follow the reasoning of the district court and this, together with the reasons first stated, leads us to reject plaintiff's contention that the term "affiliates," as used in 16 U.S.C. § 618(7)(B), is

limited to situations in which one concern exercises affirmative control over another.

■ Plaintiff contends, however—and this brings us to its second argument—that even if it is correct to consider each of the co-venturers an affiliate of the joint venture, it is not correct to consider all three as comprising a single entity. A "single entity" within the meaning of 16 U.S.C. § 618(a)(7)(A), says plaintiff, is confined by the very words of the statute to "concerns which are affiliates as defined under paragraph (B)." Therefore—the argument continues—if one is to find Pine Products and the joint venture to be affiliates, so must one also find them to constitute a single entity; similarly, in the case of Timber Investors and the joint venture—as affiliates, they too comprise a single entity. The practical effect of this view is that it leads to the recognition of two entities— two joint ventures—where, in fact, only one exists.

And therein lies the problem with the argument. The construction advocated by plaintiff ignores the fact that, under the terms of the statute, it is "a purchaser" who stands as the point of reference for identifying the concerns whose affiliations shall constitute the "single entity," not the affiliated firms themselves. Consider the words: "For purposes of determining a purchaser's buy-out limitation ... and net worth ... concerns which are affiliates ... shall be treated as a single entity." Clearly, the organizing element of the statute is the purchaser and affiliation must be determined from that standpoint. Plaintiff's argument succeeds grammatically only because it ignores this point.

Not only does a plain reading of the statute require the rejection of plaintiff's argument, but so too does its legislative history. Referring again to the Senate report, that source explains:

> The purpose of this provision [16 U.S.C. § 618(a)(7)(A)] is to assure that companies which buy timber under several names do not receive separate buy-out allocations for each purchasing entity, and to assure that a company's buy-out cost is not inequitably low simply be-

cause purchases are made in the name of one entity while the bulk of the net worth is retained under the name of another entity.

S.Rep. at 12, 1984 U.S. Code Cong. & Ad. News at 3805.

Plainly, the construction which plaintiff urges would thwart the very purpose that Congress meant to accomplish: to require affiliated purchasers to be treated as a unit to avoid the manipulation of buy-out charges.

### CONCLUSION

For the reasons stated, defendant's cross-motion for summary judgment is granted on the jurisdictional issue. Accordingly, the Clerk is directed to enter judgment dismissing the complaint for failure to join an indispensable party. No costs.